Filed 3/8/24  Sankranthi v. El Camino Hospital CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RUTH SANKRANTHI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> EL CAMINO HOSPITAL, <br><br> Defendant and Respondent. | H049506 <br> (Santa Clara County <br> Super. Ct. No. 18CV334546) |

Appellant Ruth Sankranthi[1] was terminated from her position at El Camino Hospital (ECH).  Sankranthi, who was pregnant at the time of her termination, brought an action against ECH alleging, inter alia, discrimination based on her gender and national origin, and wrongful termination after she became disabled due to pregnancy.  The trial court granted summary judgment in favor of ECH.

On appeal, Sankranthi argues that triable issues of material fact remained as to the discrimination, pregnancy disability, retaliation, and failure to prevent discrimination causes of action.  She also challenges various evidentiary findings.  Finding that summary judgment was properly granted, we will affirm the judgment.

---

[1] Sankranthi's last name was erroneously spelled as "Sankrathi" in the original complaint, and the erroneous caption was used on documents filed in this court.  On our own motion, we have corrected the caption used on appeal and will use the correct spelling of the appellant's last name in this opinion.

## I. FACTS

In October 2016, Jessica Hatala, then an interim manager in the Clinical Document Improvement (CDI) Department at ECH, interviewed Sankranthi for a CDI Specialist position. The position consisted primarily of daily clinical review of records to ensure accuracy of the records and medical coding, and to communicate with physicians to obtain missing or conflicting medical record documentation. This is a function of the hospital's Clinical Quality Department.

Hatala recommended that Sankranthi be hired with a salary of $130,000 per year. Sankranthi asked for, and Hatala approved, a higher salary of $147,000 per year. Sankranthi began working in December 2016. Hatala knew that Sankranthi identified as female and that her national origin was Indian. Hatala also hired three other CDI specialists, T.B. (who like Sankranthi was a female from India), Y.C. (an Asian female), and F.S.[2] (a Black/Nigerian male).

In the beginning, according to Sankranthi, she and Hatala had a "great" working relationship. However, Hatala noticed some problems. According to Hatala, Sankranthi "exhibited significant difficulties in performing her duties as a CDI Specialist as well as significant professionalism shortcomings." In particular, Sankranthi did not compose "clinically valid queries to physicians," her work resulted in "frequent coding mismatches," and staff members complained to Hatala about Sankranthi's "demeanor and manner of dress."

On April 10, 2017, Hatala noticed that Sankranthi and another CDI Specialist, C.E., a Mexican male, had a large number of cases marked " 'in progress,' " and as a result, informed them that they would not receive any new case assignments to provide them time to complete their cases. A week later, on April 18, 2017, Hatala noted that they had not completed the tasks, and sent both of them an e-mail requesting that they

---

[2] F.S. is the father of the child Sankranthi was pregnant with at the time of her termination.

2

complete their assignment by week's end. She also sent an e-mail to the entire CDI team, chastising them all for being late to a joint meeting with another department and for unprofessional conduct during the meeting.

On April 20, 2017, Hatala sent an e-mail to human resources (HR) regarding Sankranthi and C.E., stating that their performance was not meeting expectations. With regard to Sankranthi, Hatala noted the following: "general unprofessional behavior, inappropriate dress and flirtatious behavior, calling her coworker and telling her to leave work early and not [to] do more work than [Sankranthi], general lack of participation in the Claro education, tardiness, generally needing more work and more redirection in her work, inability to recognize and act on query opportunities that are considered a core part of our CDI job, and what I can only describe as temper tantrums." ("Claro" referred to Claro Health Care Consultants, which provided a two-week training program to the CDI's in April 2017.) Hatala also noted that "[w]e already had a 1:1 about her attitude, but I have seen no improvement over the last two weeks." Hatala asked for guidance on whether Sankranthi was eligible for a performance improvement plan (PIP), or if she could issue a written warning.

In early July 2017, Sankranthi contacted HR, spoke to HR representative Faridah Hemani, and complained about Hatala. According to Hatala, Sankranthi alleged that Hatala was " 'targeting' " her by discussing her job performance shortcomings with her. According to Sankranthi's deposition, her complaints about Hatala included: (1) Hatala told her she dressed like she was going to a club; (2) in front of other people, Hatala said she was surprised that Sankranthi owned pants; (3) Hatala waved her hand in front of Sankranthi's face and said "Hello" at a group education meeting; (4) Hatala told Sankranthi and a coworker that they looked cute from behind and that she wanted to take their picture; and (5) Hatala repeatedly talked to Sankranthi in a demeaning manner.

On July 11, 2017, Sankranthi met with HR representative Hemani, Catherine Carson (Senior Director of Quality and Hatala's supervisor), and Hatala to discuss

3

Sankranthi's concerns. Hatala acknowledged that she could be direct but emphasized to Sankranthi that she needed to dress professionally and reiterated that "coworkers had complained about [her] demeanor and dress . . . , including a comment that Ms. Sankranthi 'dressed like she was going to the club,' " which Hatala had conveyed to Sankranthi.

A few days later, on July 14, 2017, T.B. approached Hatala regarding concerns she had about Sankranthi. Later that day, Hatala summarized those concerns in an e-mail to HR and Carson. She reported that T.B. came to her because she felt "uncomfortable" around Sankranthi. T.B. reported that Sankranthi made multiple negative comments about Hatala, was not collaborating or talking with another colleague, and encouraged T.B. not to speak with or engage with that colleague. Hatala concluded by stating "it appears that [Sankranthi] is creating a toxic environment on the team and is having a negative effect on at least two members." Hatala expressed her desire to "bring this out in the open and put an end to it once and for all."

Hatala summarized her ongoing concerns in a written memo to Sankranthi dated September 7, 2017, that documented her "Oral/Verbal Counseling" (hereafter "oral counseling") sessions with Sankranthi that day and in April 2017. The memo noted that on April 3 and April 28, 2017, Hatala met with Sankranthi to discuss performance concerns, inappropriate work attire, and reports that Sankranthi encouraged another staff member to leave work when Sankranthi did and "not to send more queries than" Sankranthi did. The memo stated that Hatala had also received a report that Sankranthi told a coworker that they had been " 'doing too many reviews' " and engaged in "generally negative talk about the department." And finally, the memo noted that "a staff member alerted [Hatala] and [her department's] HR Business Representative, Hemani, that this department is a 'toxic environment' and the stress is impeding their work performance."

4

On September 7, 2017, Hatala also gave Sankranthi a three-page PIP, detailing overviews of expected competencies, how to demonstrate that competency, manager support in each competency, and expected outcomes. The PIP was in effect for 60 days, during which time Hatala met with Sankranthi on a weekly basis. In opposition to the motion, Sankranthi declared that she disagreed that there were performance "issues needing to be addressed" but signed the PIP because she was told she had to. She also declared, based on the team's monthly performance reports for June through August 2017, that her performance was "far better than that of average team members."

According to Hatala, Sankranthi's performance issues persisted into November 2017, and in consultation with HR, Sankranthi's PIP was extended by 30 days on November 6, 2017. On November 6, 2017, Hatala met with Sankranthi to discuss her performance issues and extend her PIP. Sankranthi was issued an "Action Report," which contained her "First Written Warning" for unsatisfactory work performance and described some of the issues with her work and a letter that repeated and expanded on the statements in the Action Report. The report and letter explained that Sankranthi had failed to meet the expectations of the CDI role, as well as the conditions of her 60-day performance improvement plan. The report and letter noted specifically that Sankranthi's query response results[3] were "inaccurate this past month, increasing from 55% agree rate to a 92% agree rate" and that Sankranthi had "responded to this finding by reporting that [she] did not know the correct way to report [her] results." In the letter, Hatala stated that Sankranthi had asked her to ask their team members how they would interpret the query responses. Using a sampling of Sankranthi's cases, Hatala polled the team; they discussed the responses as a group and "the team unanimously reported that the query responses from the physicians were all some degree of 'disagree,' " which indicated that

---

[3] We understand the "query response results" to mean whether the treating physician or practitioner essentially agreed or disagreed with the points raised in the CDI specialists' queries.

5

Sankranthi's results were not as high as she reported. The letter also stated that Hatala, three other ECH managers or officers, outside consultants, and others in the Clinical Quality Department had noted that Sankranthi continued "to be nonparticipatory and display closed, and negative body language in team meetings and education sessions." Sankranthi signed both the letter and the report acknowledging receipt but added that she did not agree with the results and that it was "not an accurate judgment of [her] performance." After the 90-day PIP period, and with "focused attention and much handholding," Sankranthi was able to "briefly improve and meet the CDI Specialist role's minimum requirements." However, Sankranthi's performance declined again, and by early March 2018, Hatala "consulted with HR regarding the next steps . . . including the possibility of another PIP, or the termination of her employment."

On March 18, 2018, Hatala met with Sankranthi and informed her that "she continued to demonstrate a lack of medical knowledge in her queries, that she was failing to notice mismatches in DRG[4] codes, and that she was recommending lower-weighted DRG's or medical billing codes than those supported by the medical documentation." Sankranthi insisted that the quality of her work was not poor because she was meeting productivity goals. Hatala reiterated that "*quantity does not equate to quality*," and requested that Sankranthi formulate a third PIP to improve her job performance.

On March 27, 2018, in consultation with Carson and HR, Hatala determined that a further PIP would not be helpful and decided to terminate Sankranthi's employment. On March 28, 2018, Hatala entered the termination into the ECH online portal. Because Sankranthi was out on leave that day, Hatala scheduled a meeting with Sankranthi for the following day (March 29, 2018) at 3:00 p.m. to inform Sankranthi of the termination.

---

[4] The initialism "DRG" refers to "diagnosis-related group," a coding system that classifies hospital cases according to groups that are expected to have similar hospital resource use costs. DRG's categorize patients with respect to diagnosis, treatment, and length of hospital stay, among other variables.

Sankranthi had taken leave on March 28, 2018, for a doctor's appointment. At the appointment, her physician recommended that Sankranthi, who was then five and a half months pregnant, not work due to her pregnancy and provided her with a note for her employer. Sankranthi came into work early on March 29, 2018, gave the note to HR, and requested she be placed on pregnancy disability leave. HR told Sankranthi of the dates of her pregnancy disability leave, and Sankranthi thereafter called Hartford Insurance directly to obtain disability benefits.

That same day, a few minutes before their scheduled 3:00 p.m. meeting, Sankranthi advised Hatala and Carson that she was not feeling well and left work. HR representative Hemani therefore sent Sankranthi a letter, dated March 29, 2018, advising her that her employment had been terminated. The letter stated that the "Department had determined earlier this week that despite two performance improvement plans (the initial plan and an extension) and ongoing support since that time, you had not been able to demonstrate or sustain the required level of job performance" and that the meeting scheduled for that day "was to separate your employment with" ECH.

A second letter from Hatala, dated March 30, 2018, which was hand-delivered, again advised Sankranthi that she had been terminated "for unsatisfactory performance and failure to meet the requirements of the CDI Specialist role." The letter summarized that Sankranthi had received documented oral counseling and a 60-day performance improvement plan, which "highlighted specific areas where immediate improvement was required," including delivering "compliant and clinically appropriate queries," communicating "with others in a collaborative, professional, and respectful manner," and completing "daily workload as assigned and requested by your manager (productivity)." The letter noted that on "November 6, 2018 [*sic*], at the end of 60 days, you were notified

7

that you had failed to meet [the] expectations of the PIP."[5]  The letter further noted that, as a result, Sankranthi was issued a written warning, because her "work remained inaccurate" and she "continued to remain non-participatory in meetings and education sessions."  Accordingly, the PIP was extended 30 days, after which Sankranthi was notified on December 6, 2017, that she was taken off the PIP because she had met the minimum requirements of the plan.

The letter then addressed Sankranthi's performance in the first quarter of 2018.  It noted three meetings in January, four meetings in February, and four meetings in March, at which Hatala and Sankranthi discussed individual charts that were examples of the "poor quality of the work."  The letter also noted that physicians were not agreeing with Sankranthi's work, that she was sending queries that were not supported and demonstrated a lack of medical knowledge, and that there was significant code disagreement.  Finally, the letter noted that "as we investigated these performance concerns and your work performance history[,] we became aware that you do not hold a doctorate in medicine (M.D. degree).  You had listed an MD in your employment application, but you actually hold a MBBS degree (Bachelors [*sic*] in Medicine)."  The letter concluded, "For these reasons, it is the decision of El Camino Hospital to terminate your employment, effective immediately."

## II.  PROCEDURAL HISTORY

On September 7, 2018, Sankranthi filed a lawsuit against ECH, asserting eight causes of action:  (1) discrimination based on gender and race/ethnicity/national origin (Indian); (2) violation of Pregnancy Disability Leave (PDL) statute; (3) failure to accommodate; (4) disability discrimination; (5) retaliation; (6) failure to prevent discrimination; (7) interference with Family Medical Leave Act (FMLA) rights; and

---

[5] In referring to the events of September, November, and December 2017, Hatala referred to the year as "2018."  But since the letter was sent in March 2018, that appears to have been a typographical error.

8

(8) retaliation for exercising California Family Rights Act (CFRA) leave.  ECH answered the complaint with a general denial and asserted numerous affirmative defenses.

On May 14, 2021, ECH moved for summary judgment or, in the alternative, summary adjudication.  ECH argued that Sankranthi's gender and national origin cause of action lacked merit.  Even assuming Sankranthi was a member of a protected class and suffered an adverse employment action, ECH argued she failed to demonstrate a discriminatory motive in her treatment or termination.  Rather, ECH argued that Sankranthi was terminated for unsatisfactory job performance.  ECH noted the numerous documented meetings concerning Sankranthi's job performance, complaints concerning her demeanor and behavior at work, the 60-day PIP which was extended by 30 days, and the written documentation concerning her failure to meet expectations for the CDI Specialist role.  ECH noted that in response to one of Sankranthi's queries, a physician replied that Sankranthi's query was " '*unintelligible*.' "  In sum, ECH argued that its decision to terminate Sankranthi's employment for performance-related reasons was well supported by the record, and that the reasoning could not be dismissed as pretextual.

Additionally, ECH contended that Sankranthi's disability claim failed because she could not prove that she suffered an adverse employment action because of a disability, especially in light of the fact that her disability was unknown to ECH when it decided to terminate her employment.  ECH emphasized that the decision to terminate Sankranthi's employment was made before her request for pregnancy disability leave, which rendered meritless her pregnancy-related claims.

Sankranthi opposed the motion for summary judgment.  She asserted that she dressed professionally and behaved appropriately and disagreed with the characterization of her conduct as negative or nonparticipatory.  She asserted that her performance during her 60-day PIP was "excellent" and that she received positive feedback, and despite this, Hatala extended her PIP by 30 days and issued a written warning.  Sankranthi referenced e-mails from December 2017, February 2018, and March 2018, wherein Hatala

9

characterized Sankranthi's performance positively. Sankranthi argued that asking an employee to "come up with their own PIPs" violated ECH's company policy and asserted that when the prospect of a third PIP was raised, she was more than five and a half months pregnant "and her pregnancy was showing." Sankranthi disagreed that she misrepresented her medical credentials, asserting that she was forthright about her "credentials obtained from India."

On April 19, 2021, a hearing was held on the motion for summary judgment. Following the hearing, the court issued a written order granting the motion for summary judgment. As to the discrimination claim (first cause of action), the court determined that ECH established legitimate, nondiscriminatory reasons for Sankranthi's termination, namely her job performance, and that she failed to demonstrate pretext. The court also found, in the alternative, that Sankranthi failed to establish a prima facie case for discrimination.

Addressing the pregnancy disability claim (second cause of action), the court concluded that ECH did not have knowledge of Sankranthi's pregnancy until after making its decision to fire her. The court noted that the decision to terminate Sankranthi's employment was made on March 27, 2018, two days before Sankranthi requested pregnancy disability leave on March 29, 2018. Further, the trial court noted that Hatala was unaware of Sankranthi's pregnancy when she made the final decision to terminate her employment. Although Sankranthi disputed ECH's evidence, the court found she failed to offer any evidence in opposition to raise a triable issue of fact to defeat summary judgment or summary adjudication of this claim.

As for the causes of action for failure to accommodate (third cause of action), disability discrimination (fourth cause of action), and retaliation (fifth cause of action), the court concluded, as with the second cause of action, because ECH terminated Sankranthi's employment due to her poor job performance and did so before learning of her pregnancy, these additional causes of action also failed. Addressing the failure to

10

prevent harassment and discrimination claim (sixth cause of action), the court concluded that the claim failed because Sankranthi did not allege an underlying cause of action for harassment, and because she failed to establish any unlawful discrimination by ECH.

Finally, as for the interference with FMLA rights claim (seventh cause of action) and CFRA retaliation claim (eighth cause of action), the court concluded that the claims failed because ECH made the decision to terminate Sankranthi's employment before receiving notice of her intent to take pregnancy disability leave and terminated her employment "based on her declining job performance."

On August 20, 2021, the trial court entered its order granting the motion for summary judgment, and ECH gave notice of entry of that order on September 3, 2021. On October 19, 2021, Sankranthi filed a notice of appeal from the order granting summary judgment, erroneously characterizing it as an appeal from a "[j]udgment after an order granting a summary judgment motion." Two days later, the trial court entered a judgment of dismissal based on its order granting summary judgment.

"An appeal lies from the judgment, not from an order granting a summary judgment motion." (*Kasparian v. AvalonBay Communities, Inc*. (2007) 156 Cal.App.4th 11, 14, fn. 1; Code Civ. Proc., § 437c, subd. (m)(1).) We construe Sankranthi's notice of appeal "as being from the subsequently rendered final judgment" (*Dominguez v. Financial Indemnity Co*. (2010) 183 Cal.App.4th 388, 391, fn. 1) and as having been filed on October 21, 2021, the date the trial court entered the judgment of dismissal.

### III. DISCUSSION

On appeal, Sankranthi argues that the trial court erred in granting summary judgment because triable issues of material fact remained with respect to her causes of

11

action for discrimination, violation of PDL, retaliation, and failure to prevent discrimination.[6] Sankranthi also challenges certain evidentiary rulings.

### A. General Principles Regarding Summary Judgment and Standard of Review

Summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

To be entitled to summary judgment, the moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. (Code Civ. Proc., § 437c, subd. (a)(1).) A defendant moving for summary judgment, like ECH, meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the claim. (*Id.*, subds. (o), (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 849-850, 853-854.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar*, at p. 850.) Material facts are those that relate to the issues in the case as framed by the pleadings. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67 (*Juge*).) There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, at p. 845.)

---

[6] In her opening brief, Sankranthi expressly limits the issues on appeal to these four claims and presents no argument about the trial court's rulings on her failure to accommodate, disability discrimination, interference with FMLA, and retaliation for exercising rights under CFRA claims. We therefore conclude that any challenges to the latter four claims have been forfeited. (See *Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72 [appellant forfeited argument by failing to make it in its opening brief]; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554-555.)

We review an order granting summary judgment de novo, applying the same three-step analysis the trial court uses.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*); *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972; *Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 29 (*Zamora*).)  We first identify the issues framed by the pleadings.  Next, we determine whether the moving party has established facts justifying judgment in its favor.  If the moving party has met its initial burden, the final step is to decide whether the opposing party has demonstrated the existence of a triable issue of material fact.  (*Zamora*, at p. 29, citing *Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886-887.)

We review the evidence in the light most favorable to Sankranthi, as the losing party in this case, liberally construing her evidence while strictly scrutinizing ECH's showing and resolving any evidentiary doubts or ambiguities in Sankranthi's favor.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769; *Zamora*, *supra*, 71 Cal.App.5th at p. 29.)  On appeal, as in the trial court, the "court focuses on finding issues of fact; it does not resolve them.  The court seeks to find contradictions in the evidence or inferences reasonably deducible from the evidence that raise a triable issue of material fact."  (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143-1144 (*Trop*).)

### B. Discrimination

In cases alleging employment discrimination, we analyze the trial court's order on a motion for summary judgment using a three-step process that is based on the burden-shifting test that was established for trials of employment discrimination claims in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*), citing *Guz, supra,* 24 Cal.4th at pp. 354-355 & *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111 (*Reeves*).)  This test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.  Thus, by successive steps

of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz*, at p. 354.) This same test also applies to Sankranthi's FEHA retaliation claim. (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 942.)

In the trial court, under the first step of the *McDonnell Douglas* framework, the plaintiff may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary depending upon the nature of the claim, but typically require evidence that the plaintiff (1) was a member of a protected class, (2) was performing competently in the position held or was qualified for the position sought, (3) suffered an adverse employment action, and (4) some other circumstance that suggests discriminatory motive. (*Serri, supra,* 226 Cal.App.4th at p. 860.) " 'A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff.' " (*Ibid*.) Under the second step of the test, the employer may dispel the presumption by articulating a legitimate, nondiscriminatory reason for the challenged action. "At that point the presumption disappears." (*Id*. at pp 860-861.) Under the third step, the plaintiff may attack the employer's proffered reasons as pretexts for discrimination or offer other evidence of discriminatory motive. (*Id.* at p. 861, citing *Guz, supra*, 24 Cal.4th at p. 356.)

The *McDonnell Douglas* framework is modified on a motion for summary judgment or summary adjudication. (*Serri*, *supra*, 226 Cal.App.4th at p. 861.) To obtain summary adjudication of an employment discrimination claim, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of the plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. (*Ibid.*) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons

supports their credibility . . . , the ultimate issue is simply whether the employer acted with a *motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*." (*Guz, supra*, 24 Cal.4th at p. 358.) Examples of legitimate reasons include a loss of confidence in an employee or the employee's failure to meet performance standards. (*Serri*, at p. 861.) "The employer's evidence must be sufficient to allow the trier of fact to conclude that it is more likely than not that one or more legitimate, nondiscriminatory reasons were the sole basis for the adverse employment action." (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158 (*Featherstone*).)

On summary judgment, if the employer meets its initial burden, "the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Serri*, *supra*, 226 Cal.App.4th at p. 861.) "The plaintiff's evidence must be sufficient to support a reasonable inference that discrimination was a *substantial motivating factor in the decision*. [Citations.] The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive." (*Featherstone*, *supra*, 10 Cal.App.5th at p. 1159.) "The employee's 'subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations.' [Citation.] The employee's evidence must relate to the motivation of the decision makers and prove, by nonspeculative evidence, 'an actual causal link between prohibited motivation and termination.' [Citation.]" (*Ibid*.)

The "great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its

15

actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361, fn. omitted.) "It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive. [Citations.] Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer." (*Serri, supra*, 226 Cal.App.4th at p. 862.)

### 3. Analysis

In seeking summary adjudication of the discrimination claim, ECH argued both that its decision to terminate Sankranthi was based on legitimate nondiscriminatory reasons, and that Sankranthi could not establish a prima facie case of discrimination. The trial court concluded that Sankranthi did not make the requisite prima facie showing of discrimination, and in any event, ECH established it terminated her employment based on poor job performance, and Sankranthi failed to make a showing of pretext. On appeal, Sankranthi argues that the trial court erred in granting summary judgment on her discrimination claim because there are disputed factual issues about whether Hatala acted with discriminatory motive.

We disagree. ECH met its burden of showing legitimate, nondiscriminatory reasons for Sankranthi's firing. A reason is "legitimate" if it is "facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 (*Reid*).) ECH presented evidence of concerns about Sankranthi's performance—including difficulty composing queries, coding mismatches, failure to complete her work, and complaints about her demeanor and manner of dress by both coworkers and her supervisor—arising in April 2017, early in her tenure, which resulted in a number of meetings and an e-mail to HR regarding Sankranthi's performance shortfalls. In July 2017, when Hatala and others met with

16

Sankranthi to address Sankranthi's complaints, Hatala reiterated her concerns about Sankranthi's demeanor and failure to dress professionally. ECH presented evidence that just a few days after that meeting, one of Sankranthi's coworkers complained that she felt uncomfortable around Sankranthi and that Sankranthi was not collaborating with others on the team. In September 2017, Hatala met with Sankranthi to discuss job performance issues, issued a memo documenting oral counseling for inappropriate conduct, and placed Sankranthi on a 60-day PIP. Hatala and Sankranthi met frequently during this period to improve her performance, but Sankranthi was placed on a 30-day PIP extension. In December 2017, Sankranthi's performance improved for a time, which was also documented by ECH. But by March 2018, performance concerns had reemerged. Hatala and Sankranthi met on March 18, 2018, to discuss continued concerns regarding Sankranthi's work performance and Hatala ultimately made the decision to terminate Sankranthi. In sum, ECH set forth a detailed and consistent record of documented concerns about Sankranthi's job performance, which was more than sufficient to meet its burden to show a legitimate, nondiscriminatory reason for the adverse employment action. And as the trial court noted, this shifted the burden to Sankranthi to present evidence that ECH's decision was pretextual or was motivated at least in part by prohibited discrimination.

Sankranthi did not meet her burden to demonstrate pretext or discriminatory animus. Pretext may be demonstrated by showing " 'the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge. [Citation.]' [Citation.]" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224.) To meet his or her burden, " 'the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-

17

discriminatory reasons." [Citations.]' [Citations.]" (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*), original italics; accord *Serri*, *supra*, 226 Cal.App.4th at p. 863.)

Sankranthi argues that she made the necessary showing to demonstrate national origin discrimination based on Hatala's request that she not nod her head, Hatala's comments about her appearance (she looked like she was going to a club and not owning pants), and Hatala's assertion that she had misrepresented the nature of her medical education from India. Sankranthi asserts that Hatala's "repeatedly" telling her to "stop nodding her head," was discriminatory "because nodding heads is something Indians are particularly known to do." She also asserts that as part of her culture, she generally wears dresses, and therefore comments about her clothing and appearance and not owning pants were discriminatory.

These assertions, however, are insufficient to demonstrate pretext. "An issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture." (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 (*Horn*).) Assuming Hatala did ask Sankranthi not to nod her head, Sankranthi failed to demonstrate that Hatala did so on the basis of Sankranthi's national origin. Although Sankranthi herself interpreted this as a reference to her Indian background, her own speculation or conjecture is insufficient to create a triable issue of fact. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 ["[P]laintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations"].)

As for the comments about Sankranthi's attire, she did not present evidence that she wore Indian clothing to work or that she was criticized for wearing Indian attire. There was evidence that Hatala repeatedly complained that Sankranthi dressed unprofessionally, like she was going to a club, and that Hatala counseled Sankranthi on

18

the need to wear clothing that was work appropriate. Nothing in the record supports the conclusion that the references to the way she dressed related to her Indian origin.

As for the alleged misrepresentation of the nature of her medical degree, Hatala cited this as one additional ground for her termination in her March 30, 2018, letter. The letter referenced only the nature of the degree and did not mention that it was from India. Sankranthi explained that her medical degree from India was an M.B.B.S., that medical schools in India do not award M.D. degrees, that the drop-down list in the online application that she used when she applied for the job did not include an M.B.B.S., so she selected the M.D. option; and that ECH had copies of her degree and certifications. Nothing in the record suggests that the M.B.B.S. degree is unique to India. Given the evidence that Sankranthi was terminated for repeated performance issues, the fact that the employer also mentioned alleged misrepresentations regarding the nature of her degree is not sufficient to demonstrate discrimination based on national origin.

Moreover, in our view, assuming as true Hatala's other statements, this evidence does not demonstrate a discriminatory animus or motive. While the evidence may have raised only a weak suspicion of discrimination sufficient to have sustained Sankranthi's burden of proving a prima facie case, it did not amount to substantial evidence of discrimination necessary to defeat summary judgment. Indeed, circumstantial evidence militates against any such inference. " '[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.' [Citation.]" (*Horn*, *supra*, 72 Cal.App.4th at p. 809.) If Hatala were biased against Sankranthi based on her gender or national origin, then presumably she would not have hired her in the first place. Although a significant passage of time may attenuate this "same-actor presumption" (*id.* at p. 810), in this case Hatala's concerns about Sankranthi arose very shortly after she was hired. Thus, the presumption applies with particular force here because Hatala began documenting the concerns that led to Sankranthi's

19

termination shortly after she hired her. (*West v. Bechtel Corp* (2002) 96 Cal.App.4th 966, 981.)

Nor is the evidence that Hatala complimented Sankranthi's work sufficient to show pretext. It was undisputed that Hatala was dissatisfied with Sankranthi's work performance, and that Sankranthi had received oral and written warnings about her job performance. Hatala also acknowledged providing both positive and negative feedback, and stated there was a brief period when Sankranthi's performance improved before it declined again. In other words, Sankranthi's evidence in opposition is largely *consistent* with ECH's evidence of poor job performance. Thus, Sankranthi's evidence of positive feedback fails to show an inconsistency warranting a presumption of pretext.

Sankranthi also points to the "substantial evidence of her good performance," ECH's demand that she create her own PIP in March 2018, and other alleged failures to follow its own policies regarding discipline, PIP's, and termination as further evidence of pretext. To show that an employer's reason for termination is pretextual, an employee " 'cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.) In our view, these points all go to the question whether ECH was wise or correct or prudent when it disciplined Sankranthi and ultimately terminated her employment and do not demonstrate unlawful discrimination.

Sankranthi also contends that summary judgment should be reversed based on "mixed motive." She acknowledges that the argument was not raised in the trial court but argues that this court can nonetheless consider the argument for the first time on appeal, citing *Husman v. Toyota Motor Corp.* (2017) 12 Cal.App.5th 1168, 1185. *Husman*, however, is inapposite. In that case, the court concluded that the issue was not waived because the plaintiff had set forth "evidence that discrimination was a substantial motivating factor for his discharge" and "he provided the trial court with all of the

20

elements of a mixed-motive claim." (*Id.* at pp. 1187-1188.) Such is not the case here. While the evidence in *Husman* pointed to numerous decision makers, one of which clearly "harbored stereotypical views of gay men" (*id.* at p. 1191), here Sankranthi can only point to a single decision maker and weak speculative inferences as to Hatala's discriminatory motive. Given that the record lacks a factual basis for a mixed motive claim, in exercising our discretion, we decline to consider this claim for the first time on appeal.

In a separate section of her brief, Sankranthi argues that there are triable issues as to sex discrimination. The arguments in this section rely on much of the same evidence presented in her national origin discrimination and PDL claims. We note that of the five CDI specialists in her department, two were men and three were women, and that the management personnel involved in the decisions to discipline and terminate her (Hatala and Carson) were both women. Sankranthi does not point to any evidence that she was treated differently from the men in her department based on sex. Indeed, it appears she and C.E. (a male) were treated similarly when they fell behind in their work and were not assigned new cases to permit them to catch up. And everyone on the staff received the same e-mail after they were all late to a meeting. We therefore conclude that Sankranthi has not met her burden to demonstrate pretext or discriminatory animus with regard to her sex discrimination claim.

Sankranthi argues that summary adjudication should not have been granted on her discrimination claim because ECH's separate statement did not address one of the theories of liability set forth in her complaint: that she was subject to different terms and conditions of employment based on her sex and national origin because her work was subject to a higher level of scrutiny than others in her department. Sankranthi's complaint alleged that ECH's "discrimination took many forms, including but not limited to being subjected to different terms and conditions of employment and being terminated." Since ECH's motion for summary judgment assumed that Sankranthi

21

suffered an adverse employment action and ECH met its burden of showing that it had legitimate, nondiscriminatory reasons supporting its decisions to discipline and terminate Sankranthi, we perceive no error in failing to address the different forms of alleged adverse employment action separately.

In summary, we conclude that ECH satisfied its burden to show legitimate, nondiscriminatory reasons supporting its decisions to discipline and ultimately terminate Sankranthi, and that in response, Sankranthi failed to produce substantial responsive evidence demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of ECH, either based on her national origin or that fact that she is female. We therefore hold that the trial court did not err when it granted summary adjudication of Sankranthi's discrimination claim.

### B. PDL Claim

Sankranthi argues that the trial court erred by granting summary adjudication of her PDL claim because she was terminated after she had already presented a note to HR, and was already on pregnancy disability leave, as well as the fact that by the time she requested leave, she was wearing maternity clothes and her pregnancy was visibly showing.

California's Fair Employment and Housing Act (FEHA), through the PDL statute, provides that it is an unlawful employment practice "[f]or an employer to refuse to allow an employee disabled by pregnancy, childbirth, or a related medical condition to take a leave for a reasonable period of time not to exceed four months and thereafter return to work." (Gov. Code, § 12945, subd. (a)(1).) It is also unlawful for an employer "to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this section." (Gov. Code, § 12945, subd. (a)(4).)

Sankranthi's PDL discrimination claim lacks merit because the hospital decided to terminate her employment before it knew she was disabled by pregnancy. ECH submitted evidence that it decided to terminate Sankranthi's employment on March 27,

22

2018, and entered her termination into the online system on March 28, 2018. On March 28, Sankranthi took a day off, went to see her physician, and was then told to take pregnancy-related leave. She first presented the doctor's note to ECH the following day, March 29.

Sankranthi challenges this timeline largely by asserting that the evidence submitted from the online system lacked foundation and was not properly authenticated. Hatala, however, as the person who entered the firing into the online system, had personal knowledge of the document and the facts contained therein. "[A] document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) Here, Hatala declared that she had personal knowledge of the matters contained in her declaration and that the record of the termination was a true and correct copy from the hospital's online portal. Sankranthi's challenge to the admissibility of ECH's timeline evidence is meritless, and that evidence is conclusive with respect to her pregnancy disability discrimination claim.

Sankranthi also asserts that her pregnancy was visible prior to her requesting PDL.[7] She asserts it is reasonable to presume Hatala knew about her pregnancy based on her 20-pound weight gain and because she wore maternity clothes. "When the pregnancy is apparent, or where plaintiff alleges that she has disclosed it to the employer, then a question of the employer's knowledge would likely preclude summary judgment. If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which

_____

[7] In her opening brief, Sankranthi challenges the trial court's evidentiary ruling excluding her declaration statements that she was visibly pregnant, among other evidentiary objections. In section E, *ante*, we conclude that her challenges to the court's various evidentiary rulings are forfeited for failure to provide reasoned argument with citation to authority. However, because Sankranthi's declaration statements do not affect the outcome of this appeal, here we assume without deciding, that even if the statements were admissible, Sankranthi's pregnancy disability discrimination claim fails.

23

a rational jury could infer that the employer knew that she was pregnant." (*Trop*, *supra*, 129 Cal.App.4th at p. 1145.)

Here, Sankranthi stated in her deposition that she only told the father, F.S., and her friend C.E. about her pregnancy, and that they "don't really disclose personal information to any others." Sankranthi confirmed she told no one else at the hospital that she was pregnant prior to requesting pregnancy disability leave. In addition, Hatala declared that she was not aware that Sankranthi was pregnant or suffered from any disability when ECH "finalized the decision" to fire her, that Sankranthi had not informed anyone at ECH that she was pregnant or disabled, and that "no one in management or HR knew that she was pregnant or disabled until after she submitted her leave request on March 29, 2018." In the absence of any evidence that anyone knew Sankranthi was pregnant, her speculative assertion that Hatala or HR knew about the pregnancy, when considered with Hatala's declaration of no knowledge, is " 'insufficient to create a genuine issue of material fact.' " (*Trop*, *supra*, 129 Cal.App.4th at p. 1145.)

Further, even assuming Hatala or management knew Sankranthi was pregnant, it does not necessarily follow that Hatala or management therefore knew that Sankranthi would soon be taking pregnancy *disability* leave, meaning that she would be disabled based on her pregnancy. Sankranthi cites *Trop* for the proposition that it may be inferred that her employer knew about her pregnancy based on her appearance. But *Trop* concerned a claim of pregnancy discrimination, not a claim based on pregnancy disability. Whether or not Sankranthi was visibly pregnant is logically irrelevant to her employer's knowledge of her pregnancy-related disability.

For these reasons, we conclude the trial court did not err when it granted summary adjudication of the PDL claim.

### C.  *Retaliation Claim*

Sankranthi argues there are triable issues of fact with respect to her retaliation claim. In her complaint, she asserted that she engaged in protected conduct, including

requesting protected leave time, accommodation for her pregnancy-related disability, and otherwise exercising her rights under FEHA. On appeal, she contends that triable issues remained regarding the discipline she received after she complained to HR about Hatala's conduct toward her. However, these cannot constitute material facts. As framed by the pleadings (see *Juge*, *supra*, 12 Cal.App.4th at p. 67), Sankranthi's claim of retaliation related only to her exercise of her right to pregnancy disability leave and attendant accommodations, not her complaints to HR about Hatala's conduct.

To the extent Sankranthi's retaliation claim was based on conduct related to her leave or accommodation request and pregnancy related disability, we conclude that the trial court did not err in granting summary judgment on the claim. Simply put, because the hospital established it was unaware of her pregnancy or disability at the time it fired Sankranthi, it could not have done so in retaliation for those actions.

### D. Failure to Prevent Discrimination

Sankranthi asserts that ECH's separate statement presented no facts on this issue. While she concedes a claim for failure to prevent discrimination cannot proceed in the absence of a viable discrimination claim, she argues that if summary adjudication of the discrimination claim is reversed, this claim should be reversed as well.

Because we find no error in the trial court's resolution of the discrimination claim, Sankranthi's failure to prevent discrimination claim necessarily fails.

### E. Evidentiary Objections

Both sides filed written objections to the opposing party's evidence. Sankranthi also made oral objections at the hearing on the motion. The trial court overruled all of Sankranthi's objections, sustained 14 of ECH's objections, and overruled ECH's other 12 objections. On appeal, Sankranthi challenges four of the trial court's evidentiary rulings.

According to the weight of authority, appellate courts review a trial court's evidentiary rulings in a summary judgment proceeding for an abuse of discretion. (*Serri,*

*supra*, 226 Cal.App.4th at p. 852; *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962 & fn. 7; but see *Reid, supra*, 50 Cal.4th at p. 535 [Supreme Court concluded that it need "not decide generally whether a trial court's ruling on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"] & *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, fn. 4 [observing that standard of review is unsettled and assuming, without deciding, that the abuse of discretion standard applies].) As the party challenging the court's evidentiary rulings, Sankranthi has the burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason. (*Serri*, at p. 852.)

Sankranthi challenges the trial court's order overruling her objection to exhibit J to Hatala's declaration, the "purported computer printout showing the decision to terminate [Sankranthi] was made prior to the hospital's knowledge of her pregnancy . . . ." As we have discussed the admissibility of this document previously, we will not address it separately here. Sankranthi also challenges the court's rulings sustaining three of ECH's objections to statements in her declaration and excluding those statements.

Sankranthi has failed to establish an abuse of discretion as to any of the trial court's evidentiary rulings. The trial court's evidentiary rulings are presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) " 'To demonstrate error, an appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.' [Citation.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citation.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).)

Here, Sankranthi's challenge to the trial court's evidentiary rulings are not supported by *any* citations to legal authority, and the few citations to the factual record are threadbare at best. For example, with regard to ECH's objections Nos. 4 and 16,

which were based on hearsay, it is insufficient to argue that the trial court erred in sustaining these objections without providing any legal analysis or explanation as to why the statements were not hearsay or why one of the myriad exceptions to the hearsay rule applies. Without meaningful analysis supported by relevant legal authority, Sankranthi's evidentiary arguments have been forfeited. (*S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

## IV. DISPOSITION

The judgment is affirmed.

_____
                  Greenwood, P. J.

WE CONCUR:

_____
     Wilson, J.

_____
     Adams, J.*

H049506
Sankranthi v. El Camino Hospital

_____
      * Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution